IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 18, 2014 Session

# IN RE LAUREN S.

**Appeal from the Juvenile Court for Dyer County**
**No. 09JV10      Danny H. Goodman, Jr., Judge**

_____

**No. W2013-02760-COA-R3-JV - Filed August 5, 2014**

_____

Father petitioned the trial court to, *inter alia*, modify the residential parenting schedule set forth in the permanent parenting plan. By a preponderance of the evidence, the trial court found that there was no material change in circumstances that would justify a change in the residential parenting schedule and, accordingly, dismissed Father's petition. We reverse and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed
and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Vanedda Prince Webb, Dyersburg, Tennessee, for the appellant, Derek Andrew S.

No Appellee Brief filed.

**OPINION**

FACTUAL AND PROCEDURAL HISTORY

Lauren S. was born to unmarried parents Kimberly S. ("Mother") and appellant Derek S. ("Father"). Upon petitions by both parents, the trial court entered an order of parentage dated September 2, 2009 that established Mother and Father as Lauren's natural and legal parents, named Mother as the primary residential parent, and awarded Father parenting time

1

with the child. The parties approved a proposed parenting plan order, but it was never approved by the court. For this reason and because the parties found conflicts between the parenting time schedule contained in the September 2, 2009 order and their proposed parenting plan order, they petitioned the court for a hearing.

Following a hearing, the court found that "the pattern of conflict and disagreement over the visitation schedule" constituted a material change in circumstances affecting Lauren's best interest. Accordingly, the court modified the September 2, 2009 order of parentage by entering a permanent parenting plan dated October 27, 2010. As relevant to this appeal, the permanent parenting plan designated Mother as primary residential parent and awarded Father 130 days of parenting time per year to be exercised on alternating weekends, alternating Wednesday nights during the school year, alternating summer weeks, and certain holidays and school vacations. At the time the court entered the permanent parenting plan, Father lived with his parents in Dyersburg, Tennessee, and two-year-old Lauren lived with Mother and her parents in Union City, Tennessee.[1] It was anticipated that she would attend preschool and school in Obion County.

On August 2, 2013, Father filed an amended petition to modify prior orders; this petition is the subject of this appeal. Father alleged that "there has come to exist a material change of circumstances such that it is in the best interest of the minor child that [Father] be named as the primary residential parent," and requested equal parenting time on an alternating weekly basis. On October 4, 2013, Mother filed a response asking the trial court to dismiss Father's petition.

*Evidence Adduced at the Hearing*

Mother, Father, Father's father ("Grandfather"), Father's mother ("Grandmother") (collectively, "Grandparents"), Lauren's maternal grandmother, Mother's aunt, a family friend, Lauren's dance teacher, and Lauren's former pre-kindergarten teacher testified at the hearing.[2]

In February 2011, less than four months after the court entered the permanent parenting plan, Mother and Lauren's maternal grandmother had a falling out. Mother called Grandmother to inform her that she was leaving Union City. The Grandparents welcomed Mother and Lauren into their five-bedroom, three-bathroom Dyersburg home in which Father

---

[1] Dyersburg and Union City are about thirty-six miles apart.

[2] A human resources manager at Mother's workplace and Father's former workplace also testified, but her testimony is not relevant to this appeal.

still lived.[3] This was the parties' living arrangement for about fourteen months. During that time, Father and Mother, who worked opposite shifts, shared equal parenting time and acted as Lauren's primary caregivers. According to Father, Mother was "very caring and generous with Lauren" and Lauren "loved her to death." He stated that sometimes he and Mother scheduled activities together so that Lauren could spend time with both of them.

Grandfather testified that, under the equal parenting arrangement that the parties were following, Lauren acted like "a well-behaved child" and he "saw her blossom." Grandmother observed that Lauren had a good, loving relationship with both parents. A family friend who had known Lauren since she was four months old testified that Father "does a wonderful job" of parenting Lauren and that she listens to him. Lauren's pre-kindergarten teacher during the 2012-2013 school year described her as very outgoing, loving, friendly, and socially active. When Lauren began the school year, she seemed happy and well-adjusted.

In April 2012, Mother decided to move out of the Grandparents' home to live in her own home with Lauren. Everyone supported Mother's decision; in fact, Grandmother helped find the Newbern[4] apartment that Mother ultimately moved into. Even after Mother and Lauren moved to Newbern, Lauren's schedule stayed the same in that both parents cared for her on rotating shifts and continued to spend equal time with her. Sometimes, the Grandparents would help. For example, Grandmother transported Lauren to and from pre-kindergarten for most of the 2012-2013 school year. Grandfather described the parties' working relationship as "good" while they were living in separate households, and noticed that "they shared in the responsibilities." Even though he was living with his parents, Father spent one-on-one time with his daughter. He and Lauren often enjoyed "daddy/daughter" days playing in the park, fishing, shopping, seeing a movie, eating ice cream, and dining out.

On March 10, 2013, Mother went to retrieve Lauren from the Grandparents' home and, in front of everyone, announced to her that "she wouldn't be seeing Daddy as much." Mother's reason was because she missed Lauren and "wanted to spend a little more time with her." As a result of Mother's decision, the parties resumed following the October 27, 2010 parenting plan which allowed Father parenting time with Lauren every other Wednesday night and every other weekend during the school year. Father observed a change in Lauren's behavior:

Q. Okay. And at that point then did [Mother] insist that you go back to the

_____

[3] Mother, Father, and Lauren each had a separate bedroom.

[4] Newbern and Dyersburg are approximately nine miles apart.

3

schedule that Judge Hudson put down in the parenting plan order entered October 2010?

A. Yes, ma'am.

Q. Okay. And after that date and after that time and the change was implemented did you see a change in Lauren's behavior?

A. Very much so. For a period of time she was as close to herself as she could be. She seemed almost confused that she didn't understand what was going on and over time she became very loud whenever she talked. She was more aggressive. She just seemed angry and I had to discipline her far, far more often . . . . She was hostile, not physically aggressive but her attitude was very negative.

Q. Okay. And were you aware that she was having problems at school?

A. Yes.

Lauren's teacher also perceived a "definite change in her behavior" beginning in the spring of 2013. She testified that Lauren began acting out, crying in the mornings and "at the drop of a hat," and being disruptive in class. Grandfather also noticed that, during this time period, Lauren "became more withdrawn like she was angry" and that Father had "to do a lot more discipline with her." Mother, however, testified that Lauren did not display hostility or aggressiveness around her.

During the summer of 2013, Mother and Father resumed spending equal time with Lauren on a rotating weekly basis, as set forth in the October 27, 2010 parenting plan. Grandmother noticed some improvement in Lauren's behavior. Grandfather thought that Lauren's behavior normalized after the first week of the summer schedule, and Father saw that Lauren "didn't want to be by herself so much" and that, over the summer, "[s]he continued to get around to [being] her sweet, outgoing, happy self." Mother testified that, because the house rules were not the same at her house as they were at the Grandparents' house, she had to discipline Lauren more frequently when she would first return from a stay with Father, but that she would be "fine after a couple of days."

Once the parties went back to the October 27, 2010 parenting plan, various people cared for Lauren while Mother was at work during her parenting days. At first, Mother's boyfriend's mother watched Lauren. Once that arrangement ended, Mother posted an

advertisement in search of a babysitter.[5] Mother admitted that she searched for a babysitter knowing that Father and the Grandparents were willing to care for Lauren when needed.[6] Then, Mother's friend Nikki kept Lauren at her home where she slept "on a kid cot or a kid bed." Mother recalled that "sometime there in the summer or so" one of her sisters watched Lauren in Mother's home, and another sister watched Lauren at the maternal grandmother's home while Mother worked.[7]

At the time of the October 11, 2013 hearing on Father's petition, Father was living with his parents and attending classes to earn his machinist degree. Mother was working full-time, and she and five-year-old Lauren were living in a two-bedroom duplex in Newbern. During Mother's work hours, Lauren was staying in her aunt's home where she shared a bed with her seven-year-old female cousin.

When asked why he requested a residential parenting schedule that allows Lauren to spend equal time with each parent, Father explained:

I feel that it would be in Lauren's best interest. I don't want to take her away from her mother, but I feel that spending equal time with both of us would help her grow and give her more continuity and stability in her life and it would help her to develop into a healthier young lady mentally and physically. She would get to have friends and family and just get to see everyone on an even amount of time.

At the conclusion of the hearing, the trial court rendered its ruling from the bench. The ruling was set forth in a final order entered November 26, 2013. On the issue of modification of the residential parenting schedule, the court found:

[Father] has alternatively plead that a material change in circumstance

---

[5] The advertisement, which was apparently posted on Facebook, read:

Need a sitter for my 4 year old at night. Need one by Sunday night! And I'm a single mom so can not spend a whole lot! . . . Around 8:30pm til about 7 or so in the morning . . . . Right now it will be from this Sunday til Thursday then off a week cause she['s] at her dad[']s then the week after the same days. That's for the summer . . . . I will also need a sitter throughout the year[.] [H]er dad only gets her every other weekend and every other Wednesday until we go back to court.

[6] In their testimony, the Grandparents reaffirmed their willingness to transport Lauren to and from school and extracurricular activities in Newbern.

[7] Lauren's maternal grandmother testified that she did not see Lauren very often before March 2013.

has occurred which warrant[s] a change to the residential parenting schedule. Pursuant to Tenn. Code Ann. § 36-6-101(a)(2)(C), if the issue before the Court is a modification of the Court's prior decree, then [Father] must prove by a preponderance of the evidence a material change in circumstance affecting the child's best interest. A material change in circumstance for purposes of modification of a residential parenting schedule does not require [a] showing of substantial risk of harm to the minor child. The Court has already found that there was no substantial risk of harm to the minor child.

A material change in circumstances for the purposes of modification of the residential parenting schedule may include, but is not limited to, a significant change in the needs of the child over time, which may include changes relating to age. The Court finds that at the time the original petition was filed, the child was two years old and she is now five years old. Although the child was not in school at the time the decree was entered, both the parties and the Court were aware that the minor child would be attending preschool.[8]

Additionally, at the time the decree was entered [Mother], was living in Obion County and [Father] was living in Dyer County. Since the time the decree was entered, [Mother] has re-located to Dyer County. The Court finds that this is not a detrimental change to the minor child, but rather is a beneficial change to the child, as [Mother] moved closer to [Father]. The Court finds that by a preponderance of the evidence, there is no change in the minor child's needs over time relating to her age [that] would warrant a change in the residential parenting schedule.

A material change in circumstances that would justify a change in the residential parenting schedule also includes significant changes in the parent's living or working conditions that significantly affect parenting. There has been a change in the parents' living and working conditions several times since the decree was entered. There was a change in circumstances when [Mother] moved in with [Father] and his parents; there was a change in circumstances when [Mother] moved out of the [Father's] residence; and there was a change in circumstances when [Mother] went to work. [Mother] has to work and

---

[8] On this point, the court stated as follows in its bench ruling:

I know that she was not in school when the order originally went down, but it anticipated that she was going to go to preschool. I think everyone knew that. I think the Judge knew that that was going to happen when he entered that decree.

provide for her child, which is not a negative reflection on [her]. Additionally, when [Father] and [Mother] were living with [Father's] parents, the parties agreed and thought that the living arrangement was in the minor child's best interest, so that is not a material change of circumstances. When [Mother] moved out of the home, the parties agreed that it was in the minor child's best interest. [Father's] mother, Carla [S.], testified that she helped [Mother] find an apartment . . . . Therefore, the Court finds that the change in working and living conditions do not rise to the level of a material change in circumstances that would justify a change in the residential parenting schedule.

A material change in circumstances that would justify a change in the residential parenting schedule also includes a failure to adhere to the parenting plan or other circumstances making a change in the residential parenting time in the best interest of the child. The Court finds that [Mother] has not failed to adhere to the parenting plan. [Father's] argument is that there is a material change in circumstances because [Mother] is adhering to the parenting plan. The Court finds that is not a material change in circumstances because [Mother] is doing what she is court-ordered to do: The Court ordered her to follow the parenting plan and she is following the parenting plan. Therefore, she is not failing to adhere to the parenting plan and there is no material change in circumstances that would justify a change in the residential parenting schedule.

A material change in circumstances that would justify a change in the residential parenting schedule also includes any other circumstances making a change in the residential parenting time in the best interest of the child. The Court finds that there was a change in parenting time, as [Mother] allowed [Father] to have more time than the parenting plan required. The parenting plan sets out the minimal amount of time that a parent receives and the Court always encourages all parents to provide more time than the parenting plan requires. However, if that does not work out, th[e]n the parties must follow what is ordered by the Court. The Court finds that [Mother] had issues in providing additional visitation beyond what the parenting plan required because of where she lived and that she had to drive. The Court finds that the change in parenting time does not rise to the level of a material change in circumstances that would justify changing the residential parenting time in the best interest of the child.

Accordingly, the trial court dismissed Father's petition. Father appeals.

ISSUE PRESENTED

Father raises one issue on appeal: Whether the trial court erred in ruling that Father failed to establish a material change in circumstance in regard to modification of the residential parenting schedule. Father does not challenge the trial court's designation of Mother as Lauren's primary residential parent.

STANDARD OF REVIEW

Whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interest are factual questions. *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013); *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). We review a trial court's findings of fact de novo with a presumption of correctness. Tenn. R. App. P. 13(d). Because "determining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge,'" we review such decisions for an abuse of discretion. *Armbrister*, 414 S.W.3d at 693 (citing *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1998)). "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

ANALYSIS

On appeal, Father contends that "the trial court applied a much higher standard for determining the existence of a material change of circumstance in regard to the residential parenting schedule than is required." The relevant statute with respect to a change in the residential parenting schedule (and not a change in primary residential parent) is Tenn. Code Ann. § 36-6-101(a)(2)(C), which states:

> If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of

8

the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

This statute "sets a very low threshold for establishing a material change of circumstances. Indeed, merely showing that the existing arrangement has proven unworkable for the parties is sufficient to satisfy the material change of circumstance test." *Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2 n.3 (Tenn. Ct. App. Aug. 18, 2006). Tennessee Code Annotated section 36-6-101(a)(2)(C) "reflects the General Assembly's 'policy decision to make it easier to establish that a material change in circumstances has occurred' when a party seeks to modify a residential parenting schedule." *Armbrister*, 414 S.W.3d at 703 (Tenn. 2013) (quoting *Boyer v. Heimermann*, 238 S.W.3d 249, 259 (Tenn. Ct. App. 2007)).

As to a significant change in the child's needs over time, including an age-related change, the trial court found that Lauren was two years old when the existing parenting plan went into effect and five years old at the time of the hearing on Father's petition. The court declined to find that Lauren's enrollment in preschool constituted a material change in circumstances because it was "anticipated" by the prior court order. The Tennessee Supreme Court recently considered whether a change in circumstances could justify a modification of a parenting plan, even when the change was one that could have been anticipated when the initial parenting plan was established. The Court held that it could, in light of Tennessee Code Annotated section 36-6-101(a)(2)(C), "so long as the party seeking modification has proven by a preponderance of the evidence 'a material change of circumstance affecting the child's best interest.'" *Armbrister*, 414 S.W.3d at 704.[9] We conclude that the trial court applied an incorrect standard and incorrect reasoning in determining whether Lauren's enrollment in preschool constituted a material change in circumstances affecting her best interest.

As to significant changes in Mother's and Father's living or working conditions, the trial court found "a change in the parents' living and working conditions several times since the decree was entered," as the proof clearly established. However, the court reasoned that one of the significant changes, Mother's moving into and out of the Grandparents' home, did not "rise to the level of a material change in circumstances" because it was "beneficial" and not "detrimental" to Lauren and because the parties agreed to it. The court also reasoned that

---

[9] Our Supreme Court issued the *Armbrister* opinion on October 21, 2013, after the hearing on Father's petition, but several weeks before the trial court's November 26, 2013 final order.

another change, Mother's beginning a full-time work schedule, did not "rise to the level of a material change in circumstances" because it was "not a negative reflection on [Mother]." We conclude that the trial court applied an incorrect standard by implicitly requiring Father to prove that changes in the parties' living and working conditions were detrimental to the child or reflected negatively on Mother.

As to failure to adhere to the parenting plan, the trial court found "that there was a change in parenting time, as [Mother] allowed [Father] to have more time than the parenting plan required," but found that "[Mother] has not failed to adhere to the parenting plan." The testimony clearly established that, even though a parenting plan allowing Mother and Father to enjoy 235 and 130 days of respective yearly parenting time was in effect, for over a year, both parents lived together with Lauren while they each provided care for her equally. Thereafter, for almost ten months, they continued to share equal parenting time while living apart. Given the low threshold for establishing a material change in circumstances for a proposed modification to a residential parenting schedule, we have determined that the evidence in the record preponderates against the trial court's finding that "the change in parenting time does not rise to the level of a material change in circumstances that would justify changing the residential parenting time in the best interest of the child."

Based on the entire record, we conclude that Father has established a material change in circumstances and, accordingly, reverse the trial court's order dismissing Father's petition on this ground. Our conclusion answers the first question in this modification proceeding. On remand, the trial court shall determine the child's best interests in accordance with the statutory factors and the principles set forth in *Armbrister*.

CONCLUSION

For the foregoing reasons, we reverse and remand for further proceedings consistent with this opinion. Costs of appeal are assessed against the appellee, Kimberly S., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

10